```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA

VITA MCVILLE                              CIVIL ACTION

VERSUS                                    NO: 09-6243

INTER-COMMUNITY HEALTHCARE,               SECTION: "A" (2)
INC. D/B/A OUR LADY OF
WISDOM HEALTHCARE CENTER
```

## ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment (Rec. Doc. 39)** filed by defendant Inter-Community Health Care Inc. d/b/a Our Lady of Wisdom Healthcare Center. Plaintiff Vita McVille opposes the motion. The motion, set for hearing on November 10, 2010, is before the Court on the briefs without oral argument. For the reasons that follow, the motion is GRANTED.

### I. BACKGROUND

Plaintiff Vita McVille brings this action against her former employer Inter-Community Health Care Inc. d/b/a Our Lady of Wisdom Healthcare Center ("ICH") alleging race and age discrimination and defamation. McVille is a Caucasian female and she is a registered nurse ("R.N."). ICH hired McVille in January 2006 to work the night shift at Our Lady of Wisdom Health Care Center. Our Lady of Wisdom is a residential facility rooted in the Catholic tradition which serves the needs of the aging and infirm men and women associated with certain religious

1

congregations, as well as diocesan priests and laity.[1]

On September 13, 2007, Patricia Clark, Director of Nursing ("DON") at Our Lady and McVille's immediate supervisor, terminated McVille's employment citing "negligence and falsifying of medical record." (Rec. Doc. 39-4, OLOW-0002). Clark first met McVille when the two worked as floor nurses at Jo Ellen Smith Convalescent. By the time that McVille applied for a position at Our Lady, Clark had already taken the position as the facility's DON. It was Clark who interviewed McVille at Our Lady and made the decision to hire her. Clark is an African-American female. Clark hired McVille to replace another African-American employee who had resigned without notice. (Rec. Doc. 41-14, ICH Ans. interr. # 5). McVille turned 60 on the day that she was fired.

As of February 26, 2007, just seven months prior to termination, Clark had given McVille a favorable job performance evaluation. (Rec. Doc. 41-3). But on July 24, 2007, Clark wrote McVille up for failing to follow policy and procedure with respect to medication. (Rec. Doc. 41-7, OLOW-0071). The gist of the complaint is that McVille gave one resident's Ativan medication to another resident. McVille was suspended for two days and warned that another such occurrence could lead to termination. (Id.). ICH did not cite this particular incident as part of McVille's termination notice.

---

[1] Taken from ICH's memorandum in support at pp. 1-2.

The termination notice that Clark prepared for McVille cites two other incidents in support of the "negligence and falsifying of medical record" grounds for termination. (Rec. Doc. 39-4, OLOW-0010). On September 12, 2007, McVille allegedly sent a resident to the hospital with trauma to his urethra after a Foley catheter had been removed with the bulb inflated. ("Shelton incident"). The notice states that the hospital called to report that the resident had sustained this trauma. The Shelton incident is the one referred to in the termination notice as "negligence."

Also, on September 6, 2007, McVille sent a resident named Sister Martha to the hospital for respiratory distress. The notice states that McVille had written on the patient's chart that the doctor in charge had been notified but the doctor was actually out of town and did not know that Sr. Martha had been hospitalized. (Rec. Doc. 39-4, OLOW-0010).

McVille filed the instant lawsuit against ICH claiming violations of Title VII for age and race discrimination as well as for defamation. McVille alleges that the allegations of negligence and falsifying a medical record are pretextual and constitute a "scandalous and false claim" made with malice. (Comp. ¶¶ 5, 8). With regard to the Sister Martha incident, McVille alleges that other similarly situated, younger African-American nurses (Enola McGinnis and Diedre Clegette) sent

patients to the emergency room but were not disciplined.  (Comp. ¶ 6).  McVille also alleges that on several occasions Clark undermined McVille's attempts to discipline her African-American subordinate, telling McVille that it was her word against her subordinate's.  (Comp. ¶ 3).  McVille's claims are scheduled to be tried to a jury on February 7, 2011.

ICH now moves for summary judgment on all of McVille's claims.  ICH contends that McVille cannot establish a prima facie case of race discrimination because she was not qualified for the position she held and no "similarly situateds" were treated more favorably.  Even if McVille can establish a prima facie case, ICH contends that it had legitimate, non-pretextual business reasons for terminating McVille's employment.  ICH also argues that McVille lacks evidence to support a claim for racial harrassment.  Finally, ICH contends that McVille's state law claim for defamation is completely unsupported by the evidence.[2]

## II.  **DISCUSSION**

Summary judgment is appropriate only if "the pleadings,

---

[2] ICH also moves for summary judgment on McVille's age discrimination claim.  McVille did not respond to this aspect of ICH's motion thereby suggesting that she has chosen to abandon this claim.  The Court notes that nothing in the record suggests that age discrimination played a part in Clark's decision to terminate McVille.  Moreover, McVille conceded at her deposition that she really believes that racial discrimination is the major motivating factor behind her termination.  (Rec. Doc. 39-9, Exh. F, McVille depo at 152-53).  The Court can discern no reason why Defendant's motion should not be granted as to the age discrimination claim.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." TIG Ins. Co. v. Sedgwick James, 276 F.3d 754, 759 (5th Cir. 2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. (citing Anderson, 477 U.S. at 248).  The court must draw all justifiable inferences in favor of the non-moving party. Id. (citing Anderson, 477 U.S. at 255).  Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial.  Id. (citing Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)).  Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. Id. (citing SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993)).

    *A.   Race Discrimination*

Under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff in a

Title VII discrimination case can establish a prima facie case of discrimination using circumstantial evidence. Wheeler v. BL Dev. Corp., 415 F.3d 399, 405 (5th Cir. 2005) (citing Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003)). To establish a prima facie case of discrimination the plaintiff must establish that she 1) is a member of a protected group, 2) was qualified for the position held, 3) was discharged from the position, and 4) was replaced by someone outside the protected group or was treated less favorably than other similarly situated employees outside the protected group. Id. (citing Singh v. Shoney's, Inc., 64 F.3d 217, 219 (5th Cir. 1995)).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant-employer to demonstrate a legitimate, non-discriminatory reason for the termination. Id. (citing Laxton, 333 F.3d at 578). If the employer is successful in producing such a reason, the presumption of discrimination dissipates, leaving the plaintiff with the ultimate burden of establishing by a preponderance of the evidence that the employer discriminated against the employee because of the employee's protected status. Id. In other words, the plaintiff must prove that the ostensibly legitimate reasons offered by the defendant for terminating the plaintiff were not its true reasons but were instead a pretext for racial discrimination. Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000).

McVille establishes a prima facie case of racial discrimination.  Race is a protected status, McVille clearly suffered an adverse employment action because she was terminated, and ICH replaced her with an African-American employee.  Although ICH contests whether McVille was qualified for her position in light of the more recent errors that lead to her termination, the Court finds those arguments unpersuasive.  Until those incidents that immediately preceded her termination, McVille apparently had an unblemished record for nearly forty years as a registered nurse.  McVille was clearly qualified for the position that she held at Our Lady.[3]

ICH has also met its initial burden of producing a non-discriminatory reason for the termination.  The reasons cited in the termination notice pertain to the Shelton incident and to the Sister Martha incident.  ICH also points to the Ativan incident in support of its decision to terminate McVille.  At this stage, ICH's burden is one of production and not of persuasion so ICH has successfully countered McVille's prima facie case.

---

[3] ICH also challenges McVille's prima facie case on the second aspect of the fourth prong of the prima facie case, i.e., that McVille cannot establish that she was treated less favorably than other similarly situated employees outside the protected group.  The Court agrees with this contention.  But McVille's claim is not just a disparate treatment claim because she alleges that she was terminated, at least in part, due to her race.  Therefore, McVille satisfies the fourth prong of her prima facie case by demonstrating that she was replaced with an African-American.  This fact is undisputed.

The question then is whether McVille has provided sufficient evidence to create an issue of fact as to whether ICH's proffered reasons for the termination are pretextual.  McVille's approach to this aspect of her case is to justify and explain her conduct with respect to the Sister Martha incident and the earlier Ativan incident.  And McVille denies that she did anything wrong when she removed Shelton's Foley catheter and suggests that Clark invented the entire incident.

McVille's desire to vindicate her actions, while understandable, will not help her avoid summary judgment on her Title VII claims.  The issue before this Court is not whether McVille's conduct was understandable under the circumstances, particularly with respect to the unenviable position that she faced with respect to the Ativan incident,[4] or what a jury would conclude to be the compassionate and humane course of action with respect to Sister Martha.  The issue is not whether in hindsight McVille's conduct comported with the standard of care applicable to nurses in the field or whether termination was the least

---

[4] In the Ativan incident, McVille gave one resident's Ativan medication to another resident and this was unarguably a violation of the facility's policy and procedure and drug protocol.  But McVille only took this course of action because the resident's personal physician instructed her to do so over the telephone because the resident needed the medication in the middle of the night.  McVille was clearly placed in an untenable position because she had the Hobson's choice of either directly refusing to obey the doctor's explicit orders or of violating protocol and subjecting herself to discipline, which is what ultimately occurred.

severe penalty that ICH could have imposed.  The question is whether the reasons offered by the defendant for terminating the plaintiff were not its true reasons but were instead a pretext for racial discrimination.  On this front, McVille has not met her burden.[5]

It is undisputed that the Sister Martha incident did occur and while McVille focuses on justifying her actions in sending Sister Martha to the hospital, McVille ignores that she was written up for falsifying a medical record, not for sending the patient to the hospital.[6]  It is undisputed, as demonstrated by McVille's own statements, that she called the doctor but did not speak to him yet the notation she wrote in the patient's chart is "[c]all placed to Dr. Simonson and Sr. Ada--report given--orders

---

[5] Even though the Court's role is not to determine whether the employer's decision to terminate an employee in lieu of simply imposing discipline was the "right thing to do," the Court does recognize that in some situations termination might be so egregiously excessive a response to the employee's offending conduct that perhaps the jury could choose to disbelieve the employer's proffered reasons for termination.  But even if terminating McVille seems somewhat harsh under the circumstances, this case does not present a situation where the employer's decision to terminate is so egregiously excessive so as to suggest that racial discrimination was involved.

[6] Dr. Simonson's nurse practitioner, Joanna Magee, also pointed out that the chart, in addition to stating that the patient was not to be transported to the hospital, gave specific instructions to follow in the event that the patient experienced difficulty breathing because she was prone to respiratory problems as a result of her heart condition. (Rec. Doc. 39-5, ¶¶ 6, 7, 8).  Those instructions were not followed.

obtained and noted."[7]  (Rec. Doc. 39-4).  In letters written to Dr. Simonson and to the administrators of Our Lady McVille explained that when she called Dr. Simonson's office at approximately 4:00 a.m. it was closed and a recording came on instructing that emergencies should go to the E.R. or otherwise to stay on the line to speak to the operator.  (Rec. Doc. 39-4). McVille stated that she could not wait on the line because there were other calls that she had to make so she hung up but with the intention of calling back but that she forgot to do so.  McVille explained that she did not intend to falsify a medical record but that she was simply working as fast as she could to complete the chart.  (Id.).  In her exit interview McVille refers to the incident as "mistake-human error."  (Rec. Doc. 39-4).

McVille attempts to justify the chart notation by arguing that it is not false because the recorded message at Dr. Simonson's office did say that emergencies should go to the E.R.

---

[7] Interestingly, although McVille never mentions this in the hand-written letters that she wrote immediately after her discharge, she now contends that she did in fact speak with Sr. Ada, who had the authority to make all medical decisions for Sr. Martha, and that Sr. Ada told her to send Sr. Martha to the hospital.  Sr. Ada died shortly thereafter so no one has ever been able to ask her whether McVille did in fact contact her. But as the Court appreciates the facts, the real problem with the Sr. Martha incident was not that McVille sent the patient to the hospital but rather that she put incorrect information on the patient's chart regarding the doctor's orders.  For this reason, McVille's attempt to point to "similarly situateds" based on transporting patients to the hospital is not helpful to her case.

The chart notation that McVille wrote would reasonably lead anyone to believe that McVille had given a report to Dr. Simonson and received orders--not that she considered an overnight phone recording, likely intended for non-medical professionals, to be an order received from the physician.  Indeed, McVille's own letters make clear that her intention had been to call Dr. Simonson's office back when she had time and could hold until the answering service came on the line but that she forgot.  McVille has not demonstrated that this ground for termination is pretextual.

In her opposition memorandum McVille does not dwell on the Shelton incident, which Clark specifically cited in the termination notice as the factual support for the "negligence" charge.  McVille denies that she improperly removed Shelton's catheter and that she talked to the emergency room doctor, John Langley, who denied that he had called Clark about this patient.  McVille included with her opposition what purports to be a note from Dr. Langley denying that he had called Our Lady about Shelton and denying that Shelton had received improper care.  (Rec. Doc. 41-15).  This note would be inadmissible at trial as hearsay.  Clark does not claim that the emergency room doctor called her but rather that another nurse on staff received a call from the E.R. regarding Shelton's condition.  (Rec. Doc. 39-6, Clark decl. ¶ 23).  McVille did not press Clark at her deposition

11

on the issue of who reported the Shelton incident to her.

Of course the issue is not whether McVille did in fact cause trauma to Shelton but whether ICH used the alleged incident as a pretext for discrimination. Ramirez v. City of Odessa, 38 F.3d 570 (5th Cir. 1994) (unpublished). Even if ICH's reasonable belief that the incident occurred turns out to be incorrect it will not retrospectively alter the legitimacy of the discharge for purposes of Title VII. Id. (citing Moore v. Eli Lilly & Co., 990 F.2d 812, 816 (5th Cir. 1993); Waggoner v. City of Garland, 987 F.2d 1160, 1165 (5th Cir. 1993)). The Court has no basis on this record to conclude one way or the other whether the incident occurred, and if it did not occur whether Clark's belief that the incident occurred was reasonable or whether Clark simply fabricated the Shelton incident.

That said, uncertainty as to the facts surrounding the Shelton incident cannot carry McVille through summary judgment because the record does not support the inference that racial discrimination played any role in McVille's termination. It is true that Clark was primarily responsible for terminating McVille but Wendy Lococo, Our Lady's Administrator, was consulted about the termination and concurred in the decision to terminate McVille. Sr. Marjorie Hebert, the facility's CEO, was also in agreement with the decision. Lococo and Sr. Hebert are both white. In fact it was Lococo who Joanna Magee had confronted

about the Sr. Martha incident and it was Lococo who referred the matter to Clark for handling.

Moreover, Clark knew McVille when she applied for a position at Our Lady and it was Clark who interviewed McVille and made the decision to hire her. Clark hired McVille to replace an African-American employee. It was Clark who gave McVille her last performance evaluation and it was positive. It is undisputed that Clark never used racial slurs in the workplace, and other than her reluctance to get involved in the Clara McKinley situation discussed below, Clark is not accused of engaging in any racially inappropriate conduct. Clark did replace McVille with an African-American but Lococo testified that the majority of the applicant pool at Our Lady tends to be black. (Rec. Doc. 41-4, depo. at 61). It is clear from reading McVille's deposition that she has a subjective belief that racial discrimination must have been involved in Clark's decision to terminate her because she believes that termination was not commensurate with her conduct. But subjective belief alone cannot establish a claim of discrimination. <u>Brackens v. Ennis State Bank</u>, 252 F.3d 434 (5th Cir. 2001) (unpublished).

For the foregoing reasons, ICH is entitled to summary judgment on the claim that McVille was terminated, in whole or in part, due to her race.

### B. *Hostile Work Environment*

To establish a prima facie case of hostile work environment based on racial harassment McVille must establish that 1) she belonged to a protected class, 2) she was subject to unwelcome harassment, 3) the harassment was based on race, 4) the harassment affected a term, condition, or privilege of employment, and 5) the employer knew or should have known of the harassment and failed to take prompt remedial action. LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 393 (5th Cir. 2007) (DeMoss, J., concurring in part & dissenting in part). In this circuit, the fifth element does not apply when the alleged harasser is a supervisor. Id. at 393 n.2 (citing Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999)). Moreover, the plaintiff must subjectively perceive the harassment as sufficiently severe and pervasive and this subjective perception must be objectively reasonable. Frank v. Xerox Corp., 347 F.3d 130, 138 (5th Cir. 2003) (citing Harris v. Forklift Sys., Inc., 510 U.S.,. 17 (1993)).

McVille's hostile work environment claim centers on her contentious interactions with another nurse in her area, Clara McKinley. McKinely was the nurse who relieved McVille at shift change time. McVille complained that McKinley was disrespectful to her, did not follow proper procedures, pointed her finger in McVille's face once, and abruptly pushed past her once without apologizing. McVille had complained to Clark about McKinley's

14

rude conduct but Clark had declined to intervene.

McVille has not established a prima face case of a racially hostile work environment for at least two reasons.  First, beyond McVille's subjective belief that racial animus is the only reasonable explanation for McKinley's conduct toward her,[8] the record contains no evidence from which a reasonable jury could infer that McKinley's actions were racially motivated.  McKinley never used racial slurs in the work workplace and McVille can cite to no occasion when McKinley ever made inappropriate racial

---

[8] A far more reasonable explanation for McKinley's hostility might be McVille's belief, which is patently clear from the record, that McKinley was inferior to McVille because McKinley was an LPN as opposed to an R.N.  According to McVille, an LPN is not equal to an R.N., "there is a rank" and "by nature or by law" the R.N. becomes the supervisor.  (Rec. Doc. 39-9, at 46).  Meanwhile, according to Lococo and Clark, McVille and McKinley were both hired for the same position, as floor nurses, and McVille was not McKinley's supervisor.  (Rec. Doc. 41-5, Clark depo at 35; Rec. Doc. 39-7, at ¶ 6).  In fact, according to Lococo, most of the supervisors at Our Lady were LPNs.  (See Rec. Doc. 41-4, Lococo depo at 16).
One of the complaints that McVille makes vis à vis Clark is that she treated McVille disparately because she refused to discipline McVille's subordinate––McKinley––when McVille complained about her and that if McVille had been black then Clark would have credited her complaints.  Again, the evidence does not support McVille's contention that she and Clara McKinley shared a supervisor/subordinate relationship.  Further, in a handwritten letter to Clark, McVille complained to her that she was treating McKinley as if she were McVille's equal and McVille noted that if "Arlene" were to make a similar complaint then Clark would believe her.  (Rec. Doc. 41-8).  The Arlene referred to is in fact a white employee.  (Rec. Doc. 39-3, at 16).  Thus, even if Clark did tend to give more credit to someone else's complaints than what she was giving to McVille's complaints, at the time McVille did not believe that the disparate treatment was based on race.

15

comments.

Further, the actions that McVille complains about, when viewed objectively, are not sufficiently severe or pervasive so as to affect a term, condition, or privilege of McVille's employment.  The evidence does not even support the inference that McVille held a subjective belief that the alleged harassment was so severe and pervasive so as to affect McVille's conditions of employment.  McVille never complained to anyone that McKinley's conduct was racially harassing.  In her six page letter to Sr. Marjorie and Lococo, a letter that was written after termination, McVille never once mentioned that racial harassment had been a problem at work and certainly at this point, having already been terminated, McVille cannot claim to have been fearful of reprisal from Clark.  In that letter McVille begged Sr. Marjorie and Lococo to allow her to continue her employment at Our Lady.  In her exit interview, McVille noted that her working conditions had been satisfactory and that Our Lady rated satisfactory overall as a place to work.  (Rec. Doc. 39-4).  Again, harassment based on race is never mentioned.

For all of the foregoing reasons McVille does not establish a prima facie case of a racially hostile work environment.

### C. *Defamation*

Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name.  <u>Greene</u>

16

v. State Dep't Correct., 21 So. 3d 348, 351 (La. App. 1st Cir. 2009) (citing Costello v. Hardy, 864 So. 2d 129, 139 (La. 2004)). Four elements are necessary to establish a defamation cause of action: 1) a false and defamatory statement concerning another, 2) an unprivileged communication to a third party, 3) fault (negligence or greater) on the part of the published, and 4) resulting injury. Id. The fault requirement is often set forth in the jurisprudence as malice, whether actual or implied. Id. Thus, in order to prevail on a defamation claim, a plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused the plaintiff damages. Id. (citing Costello, 864 So. 2d at 139-40). If one of the required elements of the tort is lacking then the cause of action fails. Id.

McVille's defamation claim is that Clark made "irresponsible public statements imputing infamous and derogatory acts to McVille. These statements were maliciously made to both the Louisiana Board of Nursing and the Louisiana Workforce Commission." (Rec. Doc. 41, at p. 24). McVille never identifies what specific statements are defamatory. Other than the reference in one letter to the Shelton catheter incident, which may or may not be true, nothing else in the correspondence is arguably false. Nothing in the record supports an inference of malice and nothing supports the damages element. McVille's

17

"evidence" of defamation is that while employed at JoEllen Smith there was someone there "that had a hairdresser that had – there was a client – an employee from [Our Lady] was talking about me. I feel as though there were – definitely there were rumors about me, bad rumors.  You know, trying to tarnish my reputation.  Things were said against me, hurtful things.  The word did spread around within the facility and out of the facility."  (Rec. Doc. 39-9, McVille depo at 167).  McVille did not know where these rumors started but assumed that they must have come from someone at Our Lady.  (Id.).  McVille's defamation claim is woefully lacking in evidentiary support.

      Accordingly, and for the foregoing reasons;

      **IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 39)** filed by defendant Inter-Community Health Care Inc. d/b/a Our Lady of Wisdom Healthcare Center is **GRANTED.**  Plaintiff's complaint is **DISMISSED** with prejudice.

      January 24, 2011

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE